UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AMERICAN INFOAGE, LLC, et al.,

      Plaintiffs,

v.                                    CASE NO.: 8:13-cv-1533-T-23TGW

REGIONS BANK,

      Defendant.

_____/

## ORDER

This action results from the fallout of three loans by Regions Bank[1] – the

Infoage Tampa loan, a seven-year loan; the Infoage Norcross loan, a seven-year loan;

and the Sago loan (the term of which is inconsequential to this order). For both the

Infoage Tampa loan and the Infoage Norcross loan, Infoage and Regions negotiated

an interest-rate swap. According to the plaintiffs, Regions misrepresented the terms

of each Infoage loan, misrepresented the duration and effect of each interest-rate

swap, misrepresented the consequence of loan pre-payment, levied three prohibited

penalties, refused to return money paid under an invalid contract, and concealed

material information and documentation. Thus, the plaintiffs sue for fraudulent

misrepresentation, negligent misrepresentation, three breaches of contract, unjust

_____

[1] Regions is the successor in interest to AmSouth, which issued the loans.

enrichment, and two breaches of good faith and fair dealing.  Both Regions and the plaintiffs move (Docs. 51, 53) for summary judgment.

*1. Count I and II: Fraud and Negligent Misrepresentation – Infoage*

A claim for fraudulent misrepresentation requires "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation."  *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (internal quotation marks omitted).  Like fraudulent misrepresentation, negligent misrepresentation requires a false statement of material fact.  *Butler*, 44 So. 3d at 105.  Counts I and II – claims for fraudulent and negligent misrepresentation – both allege that Regions falsely represented that "(a) the term of the Infoage loans would be 7 years, (b) given the size of the Infoage loans, interest stabilization could be achieved through utilization of an 'interest rate swap agreement,' and (c) there would be no premium or penalty for prepayment of the Infoage loans."  (Doc. 44 at ¶¶ 13, 48, 55)  Regions argues that Counts I and II fail because none of the three alleged misrepresentations is false:

Term of the Infoage Loans — Cited by Regions to prove the truth of the first representation, Sections 4(a) and (b) of the Infoage Tampa note state:

> (a) Eighty Three (83) principal payments in the amount of $7,404.00 each, together with interest accrued on the principal balance outstanding from time to time hereunder shall be due and payable

monthly, commencing on October __,[2] 2005 and continuing on the same day of each month thereafter.

(b) One (1) "balloon payment" in an amount equal to all unpaid principal and accrued and unpaid interest shall be due and payable in full on September 15, 2012 (the "Maturity Date").

(Doc. 53-3 at 2 (footnote added))  With only immaterial change, Sections 4(a) and (b)

of the Infoage Norcross note memorialize the same eighty-four-month term:

(a) Eighty Three (83) principal payments in the amount of $6,170.00 each, together with interest accrued on the principal balance outstanding from time to time hereunder shall be due and payable monthly, commencing on March 5, 2006 and continuing on the same day of each month thereafter.

(b) One (1) "balloon payment" in an amount equal to all unpaid principal and accrued and unpaid interest shall be due and payable in full on January 5, 2013 (the "Maturity Date").

(Doc. 53-4 at 2)

The eight-four-month loan terms prove Regions' alleged representation that "the term of the Infoage loans would be 7 years."  Nonetheless, ignoring Sections 4(a) and (b), Infoage argues that the representation is false because "loan" includes the corresponding interest-rate swap.  Thus, according to Infoage, Regions' description of the loans incorporates a description of the interest-rate swaps, which are for ten years, not seven.

---

[2] Either the parties failed to fill the contract's blank or the docketed copy of the contract is too faint to read. Neither party discusses the blank, but context shows that the parties intended to write "15."

- 3 -

To support an expansive construction of "loan," Infoage argues that the notes define "obligations" and "hedge obligations" broadly enough to encompass the corresponding interest-rate swap.  However, Sections 4(a) and (b) of each contract – the sections that memorialize the loan terms – employ neither "obligation" nor "hedge obligation."  More important, Infoage's argument demonstrates, at most, that the parties negotiated each Infoage note and the corresponding interest-rate swap in conjunction.  But that argument fails to establish that "loan" encompasses "swap"; to the contrary, even if negotiated in conjunction, a loan and an interest-rate swap are distinct transactions.  *See BKB Properties, LLC v. SunTrust Bank*, 453 Fed. Appx. 582, 586-87 (6th Cir. 2011) (discussing a "single transaction," or "single agreement," but distinguishing "the loan portion of the agreement" from "the swap portion of the agreement"); *see also BKB Properties, LLC v. SunTrust Bank*, 72 Fed. R. Serv. 3d 1043 (M.D. Tenn. 2009) (Trauger, J.) (same), *aff'd*, 453 Fed. Appx. 582 (6th Cir. 2011).  Accordingly, as evidenced by Sections 4(a) and (b), Regions proves the truth of the first alleged representation, i.e., that "the term of the Infoage loans would be 7 years."

Interest Stabilization — Regions argues for the truth of the second alleged misrepresentation – that "given the size of the Infoage loans, interest stabilization could be achieved through utilization of an 'interest rate swap agreement.'"  Citing the deposition of David Holmes, Infoage's expert witness, Regions asserts that

- 4 -

interest rate stabilization is attainable both in theory and "through the actual swap agreements utilized by Infoage here" (Doc. 53 at 10), even with different loan and interest-rate swap durations.  In his deposition, Holmes's states:

> Q. So I'd like to summarize where we are on the issue of maturity dates. Based on your understanding of swap agreements and commercial loans, especially those loans that were generated prior to 2007, it is possible – it is possible to achieve stabilized interest rates over the term of a commercial loan if the term of the loan and the term of the swap agreement are different, correct? It is possible?
>
> A. Yes.
>
> Q. Okay. So your statement in your expert report that "stabilized interest rates for the Loan Agreements would have required a corresponding interest rate swap agreement with a matched duration" is not correct, correct?
>
> A. Well, looking in hindsight, yes.[3]

(Doc. 49-1 at 66-67 (footnote added))  However, Holmes promptly elaborates:

---

[3] Holmes's report states:

> Stabilized interest rates for the Loan Agreements would have required a corresponding interest rate swap agreement with a matched duration. By preparing the Loan Agreements and Swap Agreement with conflicting language and mis-matched durations, . . . the Defendant . . . ma[de] Infoage's interest rate speculative . . . . Whereas an interest rate swap arrangement designed to provide a stabilized interest rate matches the duration with the intended consequence, in this case the Defendant created a mismatched duration between the Swap Agreement at five [sic] years and the underlying Loan Agreements at seven years. The result is an atypical, speculative swap arrangement that does not provide the stabilized interest rate Infoage sought and the parties agreed to.

(Doc. 53-1 at 2) During his deposition, Holmes discovered that his expert report mistakenly states "five" instead of "ten." (Doc. 49-1 at 68-69) However, when asked, "Does that change your analysis reached and your conclusions reached in your expert report at all?" Holmes responded, "No . . . ." (Doc. 49-1 at 69)

Q. Okay.

A. And that's what I thought we were trying to establish here. If we're going from 2005 out, yes, it's possible. Looking hindsight, no, it wasn't possible given what happened in interest rates and the fact that there was nothing written around this to state what happens if interest rates break up or break down, whichever way.

(Doc. 49-1 at 67)

Holmes's supplement clarifies (1) that, although interest stabilization is "possible" without matching loan and interest-rate swap maturity days, a "writ[e] around" is required for interest-rate stabilization and (2) that the interest-rate swaps in this action contain no stabilizing "writ[e] around."  Elsewhere in his deposition, Holmes twice opines that the interest-rate swaps in this action could not stabilize the interest rates:

This [interest-rate swap] is not exactly what one would do for interest rate stabilization. This allows for either a . . . break up or break down[] of the interest rates as time[] goes on. There was no real structure placed around this loan to stabilize the interest rates. This was just an open-ended swap, one swap with a fixed and a spot future on it that could go up or down depending on what happened with interest rates, and we saw what happened with the interest rates. There was no other piece in here that said, hey, if it broke to X or broke to Y, . . . there would be another hedge placed on it or there would be some sort of adjustment to the overall process.

. . . .

[T]he time value of money is X, right. And part of the lender's piece is to look at, if I'm in a mismatched swap, there is a risk attached to it, as we established earlier. Both of them are zero at start, but if I'm going three years farther on one side or the other, there should be some corresponding piece around this that says, hey, if it does X – and we don't know what X was at the time – but if it does X, this is what we should be doing. And this is just something that lenders should be

- 6 -

> cognizant of that the interest rates do change and that there is something here.
>
> As long as this is mismatched – if this was even, it would have been fine because it just moved up and down. The fact that it was mismatched, you had a different timeframe on it, and there should have been some piece around this that said, hey, given the mismatch on this, here's an amendment or here's something that says this is what goes on because it's turned into a speculative hedge day one because you have two different durations.

(Doc. 49-1 at 54-56)  Accordingly, Regions' argument that Holmes recanted his expert report is unsupported, and an issue of material fact remains.[4]

Pre-payment of the Infoage Loans — The complaint alleges that Regions falsely represented that "there would be no premium or penalty for prepayment of the Infoage loans." (Doc. 44 at ¶¶ 13, 48, 55)  Infoage's (or perhaps Regions') use of "would be" leaves ambiguous whether Regions (1) represented that the agreements "would [permit] no premium or penalty for prepayment of the Infoage loans" or

---

[4] Opposing Holmes, Regions' expert opines:

> It would also not have been unusual or unreasonable to lock rates with a swap beyond the maturity of the underlying loan. For most commercial borrowers, variable rate bank debt was the foundation of their capital structure. Since this debt was readily available and inexpensive. Many borrowers would seek to reduce variable rate risk for extended periods while financing with shorter maturity variable rate debt. Assuming that the variable-rate debt would be extended or refinance, fluctuating interest rates posed a greater financial risk than the risk of not being renewed or credit spreads widening. In 2005 with rates rising, and the difference between seven and 10 year swap rates close to zero, the choice to execute a 10 year swap with a seven-year financing maturity is not unusual, imprudent or unreasonable.

(Doc. 53-2 at 5-6)

(2) represented that Regions "would [charge] no premium or penalty for prepayment of the Infoage loans," even if the agreements permitted a penalty.  In other words, the representation might describe the text of the loan agreement or describe Regions' promised actions in the event of loan pre-payment.  Neither party recognizes the ambiguity – Regions identifies and proves only the second interpretation, and Infoage neither identifies nor disproves either.  Nonetheless, the ambiguity is not dispositive because each interpretation is true.

Section 13 of each loan proves the first interpretation (i.e., that the loan would prohibit a penalty for loan pre-payment).  Although stated in terms of "reserving" a "privilege" of pre-payment, each Section 13, in effect, prohibits a loan-pre-payment penalty. (Doc. 53-3 at 7 ("**Prepayment of Principal.** Privilege is reserved to prepay at any time, without premium or fee, the entire indebtedness evidenced hereby or any part thereof."); Doc. 53-4 at 7 (same))[5]

Regions proves the second interpretation (i.e., that Regions would charge no penalty for loan pre-payment) in unrefuted detail.  Rather than charge Infoage for loan pre-payment, Regions charged Infoage under the interest-rate swap agreements for the terminating early the interest-rate swaps.  (Doc. 53 at 13-14)  Accordingly, the second interpretation, like the first, is true, and therefore Regions' representation that

_____

[5] Although the interest-rate swaps, not the loans, contained termination fees, an interest-rate swap and a loan, as discussed above and again below, are distinct transactions. Thus, the interest-rate swap termination fee is not inconsistent with a loan term that permits loan pre-payment without penalty.

"there would be no premium or penalty for prepayment of the Infoage loans,"

however construed, is true.

Rather than challenging either interpretation, Infoage argues that Regions

breached each Section 13.  Infoage reasons that each Section 13 prohibits a penalty

not only for pre-payment of the note but also for pre-payment of the associated

interest-rate swap and that therefore Regions violated each Section 13 by charging an

interest-rate swap termination fee.  Infoage's argument is irrelevant to Counts I

and II.  By failing to argue either that the agreements permit a penalty for loan pre-

payment or that Regions charged the plaintiff for a loan pre-payment, Infoage fails to

refute either interpretation.  Even if Infoage proves both components of its argument,

Infoage contradicts neither interpretation.[6]  Thus, because the alleged

misrepresentation, however construed, is true and because Infoage fails to identify a

fact contrary to Regions' representation, Infoage's claim fails.

*2. Count III and IV: Breach of Contract – Infoage*

Counts III and IV allege that Regions breached each note's Section 13, each of

which states, "**Prepayment of Principal.**  Privilege is reserved to prepay at any time,

without premium or fee, the entire indebtedness evidenced hereby or any part

thereof."  (Doc. 53-3 at 7; Doc. 53-4 at 7)  Infoage alleges that Regions breached each

---

[6] In fact, part (1) of Infoage's argument proves the first interpretation of the alleged misrepresentation.

Section 13 by charging Infoage a pre-payment penalty under each interest-rate swap. Regions responds that each Section 13 (which is in the loan agreement, not the interest-rate swap) prohibits a pre-payment penalty under the loan but not under the interest-rate swap.

Regions argument is supported by the text of the loan. Each Section 13 is entitled "Prepayment of Principal," which suggests that each section applies to early termination of the loan, not the separate, interest-rate swap. Further, the sections apply to pre-payment of the "indebtedness evidenced hereby." Because "hereby" is written in the loan agreement, not the interest-rate swap agreement, the clause refers only to prepaying the loan. Finally, the clause applies to the pre-payment of "indebtedness" and, as Regions explains (Doc. 55 at 6), an interest-rate swap is not indebtedness.

Regions' interpretation of the two Sections 13 is further supported by *BKB Properties, LLC v. SunTrust Bank*, 2009 WL 529860 (M.D. Tenn. 2009), *aff'd*, 453 Fed. Appx. 582 (6th Cir. 2011), which resolves an almost identical dispute:

> [T]hough the purpose and practical effect of the swap may have been to provide BKB with the financial equivalent of fixed-rate financing, the terms of the agreement, taken as a whole, make clear that BKB had distinct obligations under the loan portion of the agreement and under the swap portion of the agreement – that is, BKB had an obligation to repay the Note and a separate obligation to make payments under the swap. Nowhere in the agreement does it suggest that the swap aspect of the transaction would be affected by the prepayment of the Note. Moreover, when BKB sought to prepay the Note and terminate the swap early, the amounts it owed under the terms of the swap were not the result of its prepayment of the Note but, rather, were the result of

its obligations under the swap and would have been owing regardless of whether BKB prepaid the Note. Therefore, those amounts did not constitute a penalty or premium assessed as a result of BKB's prepayment of the Note.

Infoage proffers no fact that distinguishes this action from *BKB Properties*.[7]

Instead, Infoage cites the loans' definitions of "obligation" and "hedge obligation," each of which encompasses the corresponding interest rate interest-rate swap. However, neither Section 13 uses "obligation" or "hedge obligation." As discussed above, the definitions' breadth demonstrates, at best, that the parties negotiated each Infoage note and corresponding interest-rate swap in conjunction, a fact present also in *BKB Properties*:

> The fact that these transactions [i.e., the loan and interest-rate swap transactions] constituted a single agreement that must be interpreted together does not change th[e] conclusion, as the relevant provisions

---

[7] Perhaps to criticize *BKB Properties*, Infoage cites *Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A.*, 951 N.Y.S.2d 19 (N.Y. App. Div. 2012), and states, "Where a borrower specifically negotiates a prepayment right with its lender in the context of a loan with a corresponding swap agreement, the borrower is not required to pay a swap breakage fee." (Doc. 51 at 16; Doc. 54 at 13) However, Infoage mischaracterizes *Bank Espirito*, and *Bank Espirito* is distinguishable from this action and from *BKB Properties*. In *Banco Espirito*, the parties' interest-rate swap stated, "If [prepayment] occurs, no Close Out Amount shall be payable under this Agreement." *Bank Espirito* presumed that the agreement forbade pre-payment penalty under the interest-rate swap but not for a reason applicable to this action. Indeed, unlike the parties in this action this action, the parties in *Banco Espirito* never disputed whether the pre-payment-penalty prohibition applied to the interest-rate swap. (They couldn't – the parties wrote the clause into the interest-rate swap.) Instead, because the clause employed "Close Out Amount" but the agreement defined only "Close-out Amount," "the central dispute in th[e] appeal [was] the meaning of the term 'Close Out Amount.'" If the two were synonymous, the interest-rate swap unquestionably prohibited pre-payment penalty. Thus, because this action contains no dispute over the significance of minor grammatical changes, *Banco Espirito* is inapposite. Further, to the extent that *Banco Espirito* is applicable, *Banco Espirito* supports Regions. *Banco Espirito* acknowledged that "the [parties'] agreement could have been written in such a way that defendant's obligations under the swap agreement remained, even if the senior loan was fully satisfied." For the reasons stated in this order, the agreements in this action are "written in such a way."

do not affect each other, and as the portion of the agreement pertaining to the swap does not contradict or otherwise alter the parties' obligations under the loan portion of the agreement. . . . While, as a practical matter, BKB was not obligated to make any payments under the Note once the Note was prepaid, there is nothing in the agreement that would permit the swap's explicit termination date simply to be disregarded upon prepayment of the Note.[8]

(footnote added).  In short, the Infoage notes forbid a fee levied for loan pre-payment but permit a fee levied for terminating an interest-rate swap.[9]

_____

[8] *BKB Properties, LLC v. SunTrust Bank*, 453 Fed. Appx. 582 (6th Cir. 2011), affirms the district court's holding:

> BKB's ability to prepay the Note without penalty is not dispositive of its obligations with respect to the interest-rate swap. . . . Even construing the Loan Agreement and Swap Agreement as parts of a single transaction, the terms of the agreement "make clear that BKB had distinct obligations under the loan portion of the agreement and under the swap portion of the agreement—that is, BKB had an obligation to repay the Note and a separate obligation to make payments under the Swap." *BKB Props.*, 2009 WL 529860, at *6. Thus, when BKB prepaid the Note, terminating both the loan and the interest-rate swap, the market-value payment owed to SunTrust resulted from "its obligations under the swap and would have been owing regardless of whether BKB prepaid the Note." *Id.* And, although BKB contends that the swap-termination fee functioned as a prepayment penalty under the Loan Agreement, BKB has not identified any contractual language indicating that calling the Note would absolve it of its continuing duties under the interest-rate swap. To the contrary, "there is nothing in the agreement that would permit the swap's explicit termination date simply to be disregarded upon prepayment of the Note." *Id.*

[9] Although not discussed by the parties, *Thrifty Oil Co. v. Bank of America National Trust & Savings Ass'n*, 322 F.3d 1039 (9th Cir. 2003), holds that "where the lender provides a standard interest rate swap to a sophisticated borrower and the swap serves a legitimate . . . purpose, the lender's claim for termination damages is, for all purposes, indistinguishable from a claim filed by a non-lending swap dealer." Infoage never argues that the parties are unsophisticated; the interest-rate swap is a standard International Swap Dealers Association agreement; and the interest-rate swap "serves" to stabilize Infoage's interest rate, which *Thrifty Oil* describes as a "legitimate purpose." *See Thrifty Oil*, 322 F.3d at 1054 ("[T]he interest rate swaps clearly served a legitimate nonbankruptcy purpose: to provide GWR with the equivalent of fixed-rate financing."). Accordingly, *Thrifty Oil* supports treating the loan and interest-rate swap as if Infoage negotiated each with a different person. Thus, the reservation in the loan of a right to pre-payment without penalty creates no corresponding right in the swap.

*3. Count V: Breach of Contract – Sago*

On Count V, only Sago moves for summary judgment; Regions concedes that "a myriad of issues of material facts" precludes summary judgment on this count. (Doc. 55 at 9)  Sago argues that Regions breached the Sago note by "increasing the Note's interest rate, . . . despite the fact that Sago was not actually in default." (Doc. 51 at 17)  Sago asserts that the evidence shows neither that Sago defaulted on the note nor that Regions declared Sago in default on the note.  (Doc. 51 at 17)  Even if Sago is correct,[10] Sago fails to offer any factual support for summary judgment.  A plaintiff offering no evidence fails to justify summary judgment, even if the defendant offers no evidence in response.

*4. Count VI: Unjust Enrichment – Infoage*

Regions argues that Infoage cannot pursue an unjust enrichment claim because Regions and Infoage expressly contracted to govern the "precise subject matter on which Infoage's unjust enrichment claim is based."  (Doc. 53 at 2)  Regions is partly correct – "where there is an express contract between the parties, claims arising out of that contractual relationship will not support a claim for unjust enrichment."  *Moynet v. Courtois*, 8 So. 3d 377, 379 (Fla. 3d DCA 2009).  "However, this rule does not

---

[10] Sago's second assertion – that no evidence demonstrates that Regions declared that Sago defaulted – appears doubtful. Regions cites the deposition of Miller Cooper, a Sago owner, in which Cooper admits he learned of a letter announcing Sago's default. (Doc. 46-1 at 172:14-174:6) Similarly, Regions cites a monthly statement (Doc. 55-5) sent to Sago; the statement announces the rate adjustment, and Slava Moukhov, Sago's accounting manager, admits reviewing the statement. (Doc. 52-1 at 48:15-50:25)

apply where one of the parties asserts that the contract governing the dispute is invalid." *Allegheny Cas. Co. v. Archer-Western/Demaria Joint Venture III*, 2014 WL 4162787 (M.D. Fla. Aug. 21, 2014) (Bucklew, J.).

Infoage argues that the interest-rate swaps are invalid because Infoage never "properly executed" the agreements. Infoage asserts that Miller Cooper, Infoage's CEO, signed blank documents and "never saw the swap documents until the end of the loan." (Doc. 51 at 19) Regions responds that Infoage's argument is "preposterous"; Cooper is "an experienced and successful businessman" who would never "blindly execute blank signature pages without any comprehension of the terms." (Doc. 55 at 11) Further, to contradict Cooper's testimony, Regions cites the testimony of Eric Vogt, Regions' commercial lender, who negotiated the agreements with Infoage. Finally, Regions explains that Cooper could not have signed blank documents because the agreements' signature pages include portions of the agreements. (Doc. 55 at 12) The parties' factual dispute is best resolved by trial, not by summary judgment.

In addition to arguing that the interest-rate swaps are invalid for lack of proper execution, Infoage argues that the interest-rate swaps contain a mutual mistake, which justifies rescinding the agreements. Infoage argues that the parties intended the duration of each interest-rate swap to match the duration of the corresponding loan and that the difference in the durations is a mutual mistake. Thus, Infoage

requests rescission of the contracts and, in the absence of contract, alleges a claim for unjust enrichment.  In response, Regions asserts that "Infoage cannot simultaneously assert both theories of liability – either the swap documents formed a valid contract and a 'mutual mistake' is grounds for rescission . . . or the swap documents never formed a valid contract in the first place, in which case the quasi-contractual remedy of unjust enrichment could conceivably be available." (Doc. 55 at 14-15)  Regions is partly correct – Infoage's arguments conflict.  However, Rule 8(d)(2), Federal Rules of Civil Procedure, specifically permits a plaintiff to support a claim with conflicting theories – "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."

Supposing that the contract is invalid, Regions argues that the statute of limitation bars Infoage's unjust enrichment claim.  Regions failed to raise this affirmative defense in the answer (Doc. 45), failed to raise this defense at any other stage before summary judgment, and fails to offer any justification for ignoring Rule 8(c)(1), Federal Rules of Civil Procedure, which mandates, "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . ." Accordingly, Regions fails to timely raise the statute of limitation defense, and the affirmative defense is therefore waived.  *See* Wright & Miller, *Federal Practice and Procedure* Vol. 5, § 1278 (3rd ed. 2014) ("It is a frequently stated proposition of

virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule 8(c) results in the waiver of that defense and its exclusion from the case . . . .").

Finally, Regions disputes the facts of Infoage's mutual mistake argument. However, this factual dispute is properly resolved at trial, not on summary judgment.

*5. Counts VII and VIII: Breaches of Good Faith and Fair Dealing – Infoage*

Because "a claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract," *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1152 (11th Cir. 2005), and because this order grants summary judgment in favor of Regions on Infoage's breach of contract claims (i.e., Counts III and IV), Infoage's claims for breach of good faith and fair dealing fail.

## CONCLUSION

Regions' motion for partial summary judgment is **GRANTED IN PART**. Counts I and II assert misrepresentation claims against Regions for three statements. As to each count and as to the first and third statements alleged – "[that] the term of the Infoage loans would be 7 years . . . [and that] there would be no premium or penalty for pre-payment of the Infoage loans" – Regions' motion is **GRANTED**.

Also, Regions' motion for summary judgment on Counts III, IV, VII, and VIII is

**GRANTED**.  The plaintiff's motion (Doc. 51) for summary judgment is **DENIED**.

ORDERED in Tampa, Florida, on September 25, 2014.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE